No. 24-50631

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INCORPORATED,

*Plaintiff-Appellant,*

v.

UNIVERSITY OF TEXAS AT AUSTIN; JAMES B. MILLIKEN, Chancellor of the University of Texas System in his Official Capacity; STEVEN LESLIE, Executive Vice Chancellor for Academic Affairs of the University of Texas System in his Official Capacity; DANIEL H. SHARPHORN, Vice Chancellor and General Counsel of the University of Texas System in his Official Capacity; JAY HARTZELL, Interim President of the University of Texas at Austin in his Official Capacity; BOARD OF REGENTS OF THE TEXAS STATE UNIVERSITY SYSTEM; DAVID J. BECK, Member of the Board of Regents in his Official Capacity; CHRISTINA MELTON CRAIN, Member of the Board of Regents in her Official Capacity; KEVIN P. ELTIFE, Member of the Board of Regents in his Official Capacity; R. STEVEN HICKS, Member of the Board of Regents in his Official Capacity; JODIE LEE JILES, Member of the Board of Regents in his Official Capacity; JANIECE LONGORIA, Member of the Board of Regents in her Official Capacity; NOLAN PEREZ, Member of the Board of Regents in his Official Capacity; KELCY L. WARREN, Member of the Board of Regents in his Official Capacity; JAMES C. (RAD) WEAVER, Member of the Board of Regents in his Official Capacity; DANIEL JAFFE, Interim Executive Vice President and Provost; RACHELLE HERNANDEZ, Senior Vice Provost for Enrollment Management and Student Success; MIGUEL WASIELEWSKI, Executive Director for Office of Admissions,

*Defendants-Appellees,*

BLACK STUDENT ALLIANCE; TEXAS ORANGE JACKETS; TEXAS NAACP; ADAYLIN ALVAREZ; MORGAN BENNETT; LIZ KUFOUR; BRIANNA MALLORIE MCBRIDE; DESIREE ORTEGA-SANTIAGO; NIMA RAHMAN; ALEXANDRA TRUJILLO; ROSALEEN XIONG,

*Intervenor Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, No. 1:20-cv-763 (Pitman, J.)

## OPENING BRIEF OF APPELLANT
## STUDENTS FOR FAIR ADMISSIONS, INC.

Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
Steven C. Begakis
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Students for Fair Admissions, Inc.*

## CERTIFICATE OF INTERESTED PERSONS

1.  No. 24-50631, *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*;

2.  The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

> Students for Fair Admissions, Inc.[*]
>
> Consovoy McCarthy PLLC
>
> Thomas R. McCarthy
>
> J. Michael Connolly
>
> Cameron T. Norris
>
> Steven C. Begakis
>
> University of Texas at Austin
>
> James B. Milliken, Chancellor of the University of Texas System in his Official Capacity
>
> Steven Leslie, Executive Vice Chancellor for Academic Affairs of the University of Texas System in his Official Capacity
>
> Daniel H. Sharphorn, Vice Chancellor and General Counsel of the University of Texas System in his Official Capacity
>
> Jay Hartzell, Interim President of the University of Texas at Austin in his Official Capacity
>
> Board of Regents of the Texas State University System
>
> David J. Beck, Member of the Board of Regents in his Official Capacity

---

[*] Students for Fair Admissions, Inc. has no parent corporation, and no corporation owns 10% or more of its stock.

Christina Melton Crain, Member of the Board of Regents in her Official Capacity

Kevin P. Eltife, Member of the Board of Regents in his Official Capacity

R. Steven Hicks, Member of the Board of Regents in his Official Capacity

Jodie Lee Jiles, Member of the Board of Regents in his Official Capacity

Janiece Longoria, Member of the Board of Regents in her Official Capacity

Nolan Perez, Member of the Board of Regents in his Official Capacity

Kelcy L. Warren, Member of the Board of Regents in his Official Capacity

James C. "Rad" Weaver, Member of the Board of Regents in his Official Capacity

Daniel Jaffe, Interim Executive Vice President and Provost

Rachelle Hernandez, Senior Vice Provost for Enrollment Management and Student Success

Miguel Wasielewski, Executive Director for Office of Admissions

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

Marianne W. Nitsch

Matthew C. Powers

William Christian

Black Student Alliance

Texas Orange Jackets

Texas NAACP

Adaylin Alvarez

Morgan Bennett

Liz Kufour

Brianna Mallorie McBride

Desiree Ortega-Santiago

Nima Rahman

Alexandra Trujillo

Rosaleen Xiong

Hicks Thomas, L.L.P.

Hunton Andrews Kurth LLP

Brian C. Pidcock

Carter C. Simpson

Ryan P. Phair

Lawyers' Committee for Civil Rights Under Law

Maya Brodziak

　　　　　　　　　　　　　/s/ J. Michael Connolly
　　　　　　　　　　　　Attorney of Record for
　　　　　　　　　　　　Students for Fair Admissions, Inc.

## STATEMENT REGARDING ORAL ARGUMENT

Students for Fair Admissions respectfully requests oral argument. "'[D]iscrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society.'" *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in the judgment). Whether the University of Texas at Austin, after decades of discrimination, can continue to operate an admissions process that is not blind to race is a question of substantial importance.

# TABLE OF CONTENTS

Table of Authorities ................................................................................ vi

Introduction .......................................................................................... 1

Jurisdiction ........................................................................................... 2

Statement of Issues ............................................................................... 2

Statement of the Case .......................................................................... 3

    I.     UT's Use of Race in Admissions ............................................ 3

    II.    This Litigation ........................................................................ 6

    III.   *SFFA v. Harvard* ................................................................... 6

    IV.   UT's and Other Universities' Responses to *SFFA v. Harvard* ...................... 10

    V.    Proceedings Below ................................................................ 12

Summary of Argument ........................................................................ 15

Standard of Review ............................................................................. 16

Argument ............................................................................................ 17

    I.     This case is not moot. ............................................................ 17

        A.   The case is not moot because UT's policies remain unconstitutional and SFFA has not received all the relief it requested. ......................................................... 17

        B.   UT has not carried its heavy burden to prove that it won't consider race in admissions. ................................. 19

    II.    The district court erred in refusing to grant summary judgment to SFFA. ................................................................ 24

    III.   The district court improperly refused to enter a permanent injunction ....... 28

Conclusion .......................................................................................... 33

Certificate of Service ......................................................................... 35

Certificate of Compliance ................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*AAER v. Fearless Fund Mgmt., LLC,*
103 F.4th 765 (11th Cir. 2024) ....................................................... 32

*Already, LLC v. Nike, Inc.,*
568 U.S. 85 (2013) .......................................................................... 19

*Am. Beverage Ass'n v. City & Cty. of San,*
*Fran.,* 916 F.3d 749 (9th Cir. 2019) ............................................... 32

*Arnold v. Barbers Hill Indep. Sch. Dist.,*
479 F. Supp. 3d 511 (S.D. Tex. 2020) ........................................... 29

*Aspen Tech., Inc. v. M3 Tech., Inc.,*
569 F. App'x 259 (5th Cir. 2014) ................................................... 29

*Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.,*
103 F.4th 383 (5th Cir. 2024) ......................................................... 23

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012) ...................................................... 32

*Bell v. City of Boise,*
709 F.3d 890 (9th Cir. 2013) .......................................................... 20

*Big Tyme Invs., LLC v. Edwards,*
985 F.3d 456 (5th Cir. 2021) .......................................................... 17

*Boudreaux v. La. State Bar Ass'n,*
86 F.4th 620 (5th Cir. 2023) ........................................................... 21

*Brown v. Board of Education,*
347 U.S. 483 (1954) ........................................................................ 25

*Brown v. Plata,*
563 U.S. 493 (2011) ........................................................................ 28

*CAIR-Minn. v. Atlas Aegis,*
497 F. Supp. 3d 371 (D. Minn. 2020) ............................................. 21

*CFTC v. Hunt,*
591 F.2d 1211 (7th Cir. 1979) ........................................................ 30

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) ......................................................................... iv

*Clarke v. CFTC*,
74 F.4th 627 (5th Cir. 2023) ........................................................... 18

*Coal. to Def. Affirmative Action v. Granholm*,
473 F.3d 237 (6th Cir. 2006) .......................................................... 32

*Commonwealth Sci. & Indus. Rsch. Org. v. Buffalo Tech. Inc.*,
492 F. Supp. 2d 600 (E.D. Tex. 2007) .......................................... 31-32

*Crocker v. Austin*,
115 F.4th 660 (5th Cir. 2024) ......................................................... 18

*Daves v. Dallas Cty., Tex.*,
64 F.4th 616 (5th Cir. 2023) ........................................................... 19

*De Boulle Diamond & Jewelry, Inc v. Boulle, Ltd.*,
No. 12-cv-1462, 2015 WL 5033893 (N.D. Tex. Aug. 25, 2015) ............... 33

*De Leon v. Perry*,
975 F. Supp. 2d 632 (W.D. Tex. 2014) ........................................... 31

*DOJ v. Daniel Chapter One*,
89 F. Supp. 3d 132 (D.D.C. 2015) ............................................. 29, 30

*DynaLantic Corp. v. DOD*,
885 F. Supp. 2d 237 (D.D.C. 2012) ................................................ 29

*EEOC v. Wilson Metal Casket Co.*,
24 F.3d 836 (6th Cir. 1994) ............................................................ 28

*FFRF v. Abbott*,
955 F.3d 417 (5th Cir. 2020) ................................................... 19, 21-22

*FFRF, Inc. v. Abbott*,
58 F.4th 824 (5th Cir. 2023) ........................................................... 23

*Fikre v. FBI*,
904 F.3d 1033 (9th Cir. 2018), *aff'd*, 601 U.S. 234 (2024) .............. 22, 23

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013) .................................................................. *passim*

*Fisher v. Univ. of Tex. at Austin*,
579 U.S. 365 (2016) ........................................................... 1-2, 4, 5

*Floyd v. City of N.Y.*,
    959 F. Supp. 2d 668 (S.D.N.Y. 2013) ....................................................30, 33

*Free Speech Coal., Inc. v. Colmenero*,
    689 F. Supp. 3d 373 (W.D. Tex. 2023), *vacated in part on other grounds*,
    95 F.4th 263 (5th Cir. 2024) ........................................................................ 31

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................................19, 20

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)............................................................................4, 14, 21

*Gulfport Energy Corp. v. FERC*,
    41 F.4th 667 (5th Cir. 2022)......................................................................... 18

*Hernandez v. Cremer*,
    913 F.2d 230 (5th Cir. 1990)......................................................................20-21

*Hopwood v. Texas*,
    78 F.3d 932 (5th Cir. 1996) ........................................................................ 1, 3

*Howe v. City of Akron*,
    801 F.3d 718 (6th Cir. 2015) ..................................................................16, 28

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
    408 F. Supp. 3d 960 (S.D. Iowa 2019), *aff'd*, 5 F.4th 855 (8th Cir. 2021) ................ 22

*Jackson Women's Health Org. v. Currier*,
    760 F.3d 448 (5th Cir. 2014) ....................................................................... 33

*Joyce v. Town of Dennis*,
    720 F.3d 12 (1st Cir. 2013) .......................................................................... 32

*Knox v. SEIU, Loc. 1000*,
    567 U.S. 298 (2012)................................................................................17, 18

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*,
    540 F.3d 752 (8th Cir. 2008) ....................................................................... 29

*MacGinnitie v. Hobbs Grp., LLC*,
    420 F.3d 1234 (11th Cir. 2005) .................................................................... 31

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ..................................................................................... 29

*N.Y. State Rifle & Pistol Ass'n, Inc. v. NYC*,
    590 U.S. 336 (2020)...................................................................................... 18

*Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas,*
  903 F. Supp. 2d 446 (N.D. Tex. 2012) .......................................................... 29

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,*
  508 U.S. 656 (1993) ....................................................................................... 17

*Opulent Life Church v. City of Holly Springs, Miss.,*
  697 F.3d 279 (5th Cir. 2012) ......................................................................... 29

*Plessy v. Ferguson,*
  163 U.S. 537 (1896) ....................................................................................... 26

*Pope v. United States,*
  323 U.S. 1 (1944) ..................................................................................... 25, 30

*Rd.-Con, Inc. v. City of Philadelphia,*
  --- F.4th ---, 2024 WL 4597253 (3d Cir. Oct. 29, 2024) ............................. 23

*Reynolds v. Preston,*
  No. 22-cv-8408, 2023 WL 2825932 (N.D. Cal. Mar. 15, 2023) .................. 21

*Rush v. Nat'l Bd. of Med. Exam'rs,*
  268 F. Supp. 2d 673 (N.D. Tex. 2003) .......................................................... 33

*SFFA v. Harvard,*
  No. 14-cv-14176, Dkt. 754 (D. Mass. Jan. 9, 2024) ............................... 10, 13

*SFFA v. Univ. of Tex. at Austin,*
  37 F.4th 1078 (5th Cir. 2022) .................................................................... 6, 13

*SFFA v. Yale Univ.,*
  3:21-cv-241, Dkt. 28 (D. Conn. May 13, 2021) .............................................. 6

*Sefick v. Gardner,*
  164 F.3d 370 (7th Cir. 1998) ......................................................................... 21

*Smith v. South Dakota,*
  781 F. Supp. 2d 879 (D.S.D. 2011) ............................................................... 29

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) ............................................................. 20, 23, 24

*Speech First, Inc. v. Sands,*
  2023 WL 6161318 (S.Ct.) ............................................................................... 24

*Speech First, Inc. v. Schlissel,*
  939 F.3d 756 (6th Cir. 2019) .................................................................... 20, 22

*Students for Fair Admissions v. Harvard*,
  600 U.S. 181 (2023) ................................................................... *passim*

*Texas v. Yellen*,
  105 F.4th 755 (5th Cir. 2024) ................................................. 17

*Tucker v. Gaddis*,
  40 F.4th 289 (5th Cir. 2022) ..................................... 16, 19, 20

*United States v. Atkins*,
  323 F.2d 733 (5th Cir. 1963) ................................................. 21

*United States v. Bob Lawrence Realty, Inc.*,
  474 F.2d 115 (5th Cir. 1973) ............................................ 29-30

*United States v. Fletcher ex rel. Fletcher*,
  805 F.3d 596 (5th Cir. 2015) ................................... 13, 16, 27

*United States v. Fordice*,
  505 U.S. 717 (1992) ............................................................... 27

*United States v. Sage Pharms., Inc.*,
  210 F.3d 475 (5th Cir. 2000) ................................................. 16

*United States v. W.T. Grant Co.*,
  345 U.S. 629 (1953) ............................................................... 29

*Vote.org v. Callanen*,
  609 F. Supp. 3d 515 (W.D. Tex. 2022) ............................... 29

*Williams v. Illinois*,
  399 U.S. 235 (1970) ............................................................... 33

## Statutes and Other Authorities:

U.S. Const, amend. XIV ..........................................2, 6, 7, 27

28 U.S.C. § 1331 ........................................................................ 2

28 U.S.C. § 1343 ........................................................................ 2

28 U.S.C. § 1291 ........................................................................ 2

Amicus Br. of FIRE, *Speech First, Inc. v. Sands*, 2023 WL 6161318 (S.Ct.) ............... 23-24

Amicus Br. of Tex., *SFFA v. Harvard*, 2022 WL 2919683 (S.Ct.) .................................... 6

Lukianoff & Goldstein, *Speech Code Hokey Pokey*, Volokh Conspiracy
  (Sept. 12, 2018), perma.cc/Q32F-RPEK ....................................... 23

Tex. Educ. Code § 51.803 ................................................................................ 4

**INTRODUCTION**

In *Students for Fair Admissions v. Harvard*, the Supreme Court held that "'[o]ur Constitution is color-blind'" and that all "'racial discrimination in public education'" is unconstitutional. 600 U.S. 181, 204, 230 (2023). In response, universities across the country began reforming their admissions process to comply with the Constitution. SFFA resolved three of its four then-pending lawsuits—against Harvard, the University of North Carolina, and Yale University—after each university agreed to adopt reforms to prevent race from being used in their admissions processes. These universities imposed a firewall preventing admissions officers from learning the race of an applicant through "check-box" data, and they prohibited admissions officers from receiving data identifying the racial composition of admitted students during the admissions process.

The University of Texas at Austin refused to take those steps. Even after *Harvard*, UT will not blind its admissions officers from learning an applicant's race, and it continues to give admissions officers aggregate data showing the racial composition of the admitted class and comparing this year's composition to the year before. Despite repeated inquiries from SFFA, UT has never provided an answer for why it continues to use race in this manner.

Perhaps UT's resistance shouldn't have been surprising. UT has long used race in admissions, and it has vigorously fought efforts to stop its racial discrimination. *See Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996); *Fisher v. Univ. of Tex. at Austin* ("*Fisher I*"), 570 U.S. 297, 304-05 (2013); *Fisher v. Univ. of Tex. at Austin* ("*Fisher II*"), 579 U.S. 365,

1

375 (2016). But that is precisely why this litigation remains necessary. The district court should have declared UT's longstanding and revised admissions policies unlawful and entered a permanent injunction prohibiting any individuals in UT's admissions office from receiving or having access to racial check-box data or aggregate reports on race during the admissions process.

Yet the district court refused, concluding that this case is moot because UT promised not to use race in the future. That was error. This case is not moot because the revised policy remains unlawful and SFFA is entitled to permanent injunctive relief. And *Harvard* entitled SFFA to judgment against UT, not a dismissal for lack of jurisdiction.

This Court has already reversed the district court once in this case. It should do so again—this time, with instructions to award SFFA relief.

## JURISDICTION

The district court had jurisdiction because SFFA alleges violations of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964. 28 U.S.C. §§1331; 1343. This Court has jurisdiction under 28 U.S.C. §1291 because SFFA appeals from a final judgment. The district court entered that judgment on July 15, 2024, ROA.2014, and SFFA timely appealed on July 26, ROA.2016.

## STATEMENT OF ISSUES

SFFA sued UT over its race-based admissions process. While this case was ongoing, the Supreme Court ruled in *Harvard* that race-based admissions violate the Equal

Protection Clause and Title VI. To comply with that decision, universities established new procedures to blind admissions officers to the race of applicants. But not UT. While UT claims to have removed race as a factor in admissions, its process is not "'color-blind.'" *Harvard*, 600 U.S. at 230. UT continues to let admissions officers see the race of applicants and provides senior admissions officers with up-to-date aggregate racial data on the admitted class, including year-to-year comparisons broken down by race. The questions presented are:

1. Do UT's purported reforms of its race-based admissions practices moot this case?

2. Is SFFA entitled to summary judgment that UT's original and revised admissions policies are unlawful?

3. Is SFFA entitled to a permanent injunction against UT?

## STATEMENT OF THE CASE

**I.     UT's Use of Race in Admissions**

Before 1996, UT considered two factors in the admissions process: an "Academic Index" reflecting an applicant's test scores and academic performance in high school, and the applicant's race. *Fisher I*, 570 U.S. at 304. In 1996, this Court held this system unconstitutional in *Hopwood*. *See* 78 F.3d at 934. Following *Hopwood*, UT created a new holistic metric of a candidate's potential contribution to UT, to be used in conjunction with the Academic Index. *Fisher I*, 570 U.S. at 304. This "Personal Achievement Index" measures "a student's leadership and work experience, awards, extracurricular activities, community service, and other special circumstances." *Id.*

3

The Texas Legislature also responded to *Hopwood*. It enacted a law known as the Top Ten Percent Law, codified at Tex. Educ. Code §51.803. The Top Ten Percent Law grants automatic admission to any public state college, including UT, to all students in the top 10% of their class at high schools in Texas that comply with certain standards. *Fisher I*, 570 U.S. at 305. "The University's revised admissions process, coupled with the operation of the Top Ten Percent Law, resulted in a more racially diverse environment at the University." *Id.*

"Notwithstanding these lauded results, UT leapt at the opportunity to reinsert race into the process." *Fisher II*, 579 U.S. at 395 (Alito, J., dissenting). On June 23, 2003, the Supreme Court decided *Grutter v. Bollinger*, 539 U.S. 306 (2003), which upheld the University of Michigan Law School's race-conscious admissions. In *Grutter*, the Supreme Court warned that a university contemplating the consideration of race as part of its admissions process must engage in "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." *Id.* at 339. Yet "*on the very day Grutter was handed down*, UT's president announced that '[t]he University of Texas at Austin will modify its admissions procedures' in light of *Grutter*, including by 'implementing procedures at the undergraduate level that combine the benefits of the Top 10 Percent Law with affirmative action programs.'" *Fisher II*, 579 U.S. at 395 (Alito, J., dissenting).

UT thus "adopted a third admissions program, the 2004 program in which [UT] reverted to explicit consideration of race." *Fisher I*, 570 U.S. at 305. To award racial

preferences, UT "included a student's race as a component" of the Personal Achieve-ment Index. *Id.* at 306. UT "asks students to classify themselves from among five pre-defined racial categories on the application": "American Indian or Alaska Native," "Asian," "Black or African American," "Native Hawaiian or Other Pacific Islander," and "White." *Id.*; *see* ROA.1658 [¶14]. Although "[r]ace [was] not assigned an explicit numerical value," it was "undisputed that race [was] a meaningful factor" in the admis-sions process. *Fisher I*, 570 U.S. at 306.

UT defended its latest race-based admissions process for years, including two trips to the Supreme Court. In 2013 and 2016, the Supreme Court issued decisions in a lawsuit brought by Abigail Fisher, a white student from Texas who was denied admis-sion to UT. *Id.* at 301-02; *Fisher II*, 579 U.S. at 375. The Supreme Court ruled for UT in *Fisher II*. Although it rejected Fisher's claims, the Court emphasized that it had resolved only the "narrow question" of whether she was denied equal treatment "at the time her application was rejected" in 2008. *Fisher II*, 579 U.S. at 380. The Court warned that its "affirmance of the University's admissions policy today does not necessarily mean the University may rely on that same policy without refinement." *Id.* at 388. UT had an "ongoing obligation to engage in constant deliberation and continued reflection regard-ing its admissions policies." *Id.*

Following *Fisher II*, UT "made no changes" to its use of race in admissions. ROA.1743-44. UT thus continued to consider "an applicant's race and ethnicity" as part of its "holistic review process." ROA.1656 [¶11]. The State of Texas, for its part,

has since admitted that "Abigail Fisher was right." Amicus Br. of Tex., *SFFA v. Harvard*, 2022 WL 2919683, at \*2 (S.Ct.).

## II.     This Litigation

On July 20, 2020, SFFA sued UT, alleging that its use of race in the admissions process is unconstitutional. ROA.18, 219-28. SFFA sought, among other relief, a declaration that UT's "admissions policies and procedures violate the Fourteenth Amendment . . . [and] Title VI of the Civil Rights Act" and a permanent injunction requiring UT to "conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission." ROA.228. A group of students and student organizations were allowed to intervene as defendants. ROA.22.

After the district court granted UT summary judgment on res judicata grounds, this Court reversed. *See SFFA v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1081 (5th Cir. 2022). This Court also held that SFFA had Article III standing. *See id.* at 1084-86. The case was then stayed pending the Supreme Court's resolution of *SFFA v. Harvard* and *SFFA v. UNC*. ROA.27, 1588, 1598; *accord SFFA v. Yale Univ.*, 3:21-cv-241, Dkt. 28 (D. Conn. May 13, 2021) (staying SFFA's case against Yale pending *Harvard* and *UNC*).

## III.     *SFFA v. Harvard*

Both Harvard and UNC used a multi-stage admissions process that considered an applicant's race at every step of the process, including the admissions decisions themselves. *Harvard*, 600 U.S. at 192-97. Neither used a percentage method, like the Top Ten

Percent plan in Texas. SFFA sued Harvard and UNC, arguing that their "race-based admissions programs violated" Title VI and the Fourteenth Amendment. *Id.* at 197-98. In June 2023, the Supreme Court held that both Harvard's and UNC's use of race in admissions violated the Equal Protection Clause (and thus also Title VI). *Harvard*, 600 U.S. at 230.

In ruling for SFFA, the Court reiterated its precedent that any use of race must survive "'strict scrutiny'" and that "only two compelling interests" can: "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons." *Id.* at 206-07. Even with a compelling interest, "race-based state action" is permitted only "in the most extraordinary case." *Id.* at 208. The Court examined Harvard's and UNC's race-based admissions under this standard and held that they failed it for six main reasons. *Id.* at 213-25.

First, Harvard and UNC failed to justify their consideration of race by identifying interests capable of being "subjected to meaningful judicial review." *Id.* at 214. The Court rejected all of Harvard's and UNC's asserted interests, including:

- "'training future leaders in the public and private sectors,'"
- "preparing graduates to 'adapt to an increasingly pluralistic society,'"
- "'better educating its students through diversity,'"
- "'producing new knowledge stemming from diverse outlooks,'"
- "'promoting the robust exchange of ideas,'"
- "'broadening and refining understanding,'"

- "'fostering innovation and problem-solving,'"
- "'preparing engaged and productive citizens and leaders,'"
- "'enhancing appreciation, respect, and empathy,'"
- "'cross-racial understanding,'" and
- "'breaking down stereotypes.'"

*Id.* None of these goals were "sufficiently coherent for purposes of strict scrutiny." *Id.*

Second, Harvard and UNC did not justify their use of race by "articulat[ing] a meaningful connection between the means they employ and the goals they pursue." *Id.* at 215. Specifically, Harvard and UNC had students self-identify through check boxes as one of several racial categories, and it was not evident how these categories achieve "the educational benefits that the universities claim to pursue." *Id.* at 216. Harvard's and UNC's racial categories of "Asian" and "Hispanic," for example, were too "imprecise" and thus "undermin[e]" rather than "promot[e]" the Universities' purported interests. *Id.* at 216-17.

Third, Harvard and UNC "used [race] as a 'negative'" in admissions. *Id.* at 218. Because "[c]ollege admissions are zero-sum," a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218-19. This violates the Equal Protection Clause even if it impacts only "some . . . of the students they admit." *Id.* at 219.

Fourth, Harvard and UNC used race "as a stereotype." *Id.* at 218. "The point of [their] admissions programs [was] that there is an inherent benefit in . . . race for race's

sake." *Id.* at 220. For example, UNC argued that "race in itself 'says [something] about who you are.'" *Id.*

Fifth, Harvard's and UNC's use of race was a form of prohibited racial balancing. *Id.* at 221-24. While Harvard and UNC did not identify strict numerical benchmarks, they sought "proportional representation" by seeking a "rough percentage of various racial groups." *Id.* Harvard's admissions officers also would review aggregate admissions data providing a "breakdown of applicants by race" during the admissions process so they could "'trac[k] how each class is shaping up relative to previous years.'" *Id.* at 194, 222.

Sixth, Harvard's and UNC's use of race lacked a "'logical end point.'" *Id.* at 221. It was impossible to know when considering race was no longer necessary to obtain the "educational benefits of diversity." *Id.* at 224. Harvard and UNC couldn't even identify a sunset date. *Id.* at 225.

The Court also rejected Harvard's and UNC's argument that "universities are 'owed deference.'" *Id.* at 217. Harvard and UNC could not simply say, "'trust us,'" but needed to provide "an exceedingly persuasive justification that is measurable and concrete enough to permit judicial review." *Id.* In the end, because "'[o]ur Constitution is color-blind,'" all "'racial discrimination in public education,'" including the race-based holistic admissions practiced by "[m]any universities," is prohibited by the Constitution. *Id.* at 204, 230-31.

**IV.    UT's and Other Universities' Responses to *SFFA v. Harvard***

In response to *Harvard*, universities across the country announced that they would adopt a race-blind admissions process. In addition to instructing admissions officers to no longer use race in admissions, universities prevented race—the most pernicious of government tools—from being used.

Specifically, most universities are preventing admissions officers from receiving so-called check-box information about the race of applicants during the admissions process. For example, North Carolina universities must "firewall knowledge of an applicant's race from those who are reviewing and evaluating the applications." ROA.1758. Similarly, Yale agreed to "take technological steps to ensure that no person involved in making admissions decisions has access to check-box racial . . . at any time during the admissions review cycle." ROA.1763-64. And the District of Massachusetts issued a final judgment ordering Harvard to "ensure that admissions readers *do not have access* to . . . self-reported check-box race or ethnicity from the Common App or any similar application form." Final Judgment, *SFFA v. Harvard*, No. 14-cv-14176, Dkt. 754 (D. Mass. Jan. 9, 2024) (emphasis added).

Relatedly, universities instructed their admissions offices to never provide admissions officers with data during the admissions process about the racial composition of admitted students. For example, Yale agreed that its "admissions office will not run any reports during the review cycle that would provide any aggregate data with regard to the racial composition of admitted students." ROA.1764. Haverford College promised

to blind staff to applicants' race and "the racial composition of the class." ROA.1769. And the District of Massachusetts ordered Harvard to "ensure that admissions readers do not have access to . . . aggregated data (meaning data about two or more applicants assembled in any form, physical or digital) reflecting applicants' self-reported race or ethnicity at any time until after the admissions process has concluded." *Harvard* Final Judgment, *supra*.

Shockingly, UT refused to do what UNC, Harvard, and its peers deemed necessary. After *Harvard*, UT told SFFA that it would "remove data on the applicant's race and ethnicity from the application files provided to reviewers during the holistic review process" and instruct reviewers that "an applicant's race and ethnicity cannot be considered in the holistic review process." ROA.1779, 1657 [¶12]. But UT vowed to continue other race-conscious measures.

UT refused to blind its admissions officers from learning the race that each candidate self-reported in their application. UT employs "about 85 full-time staff members in the admissions office," and all of them will "have access to UT Austin's database of applicant file information." ROA.1786. This database "contains applicants' self-reported 'check-box information' regarding race/ethnicity." ROA.1786. Although restricting access to this information is easy, UT refused to implement a firewall and instead insists that its staffers can simply be trusted not to "access the 'check-box information.'" ROA.1786.

Further, senior admissions officers will continue to have access to and receive "aggregated data showing numbers of persons who have applied to, been admitted to, and enrolled at UT" broken down by "race/ethnicity." ROA.1778. This "dashboard" of information "includes the aggregate percentages of race/ethnicity for each category: applied, admitted, and enrolled." ROA.1778. It is "updated daily and includes both current numbers and year-over-year changes." ROA.1778. Senior admissions officers will have access to this data even though they "participate in the holistic review process." ROA.1786, 1662 [¶26]. In correspondence with SFFA, UT said it provides this aggregated data to admissions officers so they can recruit certain racial minorities and "monito[r] and repor[t] . . . trends on the [racial] composition of the student population." ROA.1787-88, 1778-79. When asked why it was "necessary for individuals in the Admissions Office—instead of UT officials unconnected with admissions decisions—to have access to this racial data," UT merely repeated its assurance that these admissions officers had been told "not [to] use data concerning race or ethnicity for admissions decisions." ROA.1787-88.

## V.    Proceedings Below

Unlike SFFA's litigation with UNC, Harvard, and Yale, SFFA was unable to resolve its case with UT because UT refused to take basic steps to ensure that race is no longer used in the admissions process. After negotiations broke down, *see* ROA.1784-88, the parties filed motions with the district court.

UT and the Intervenors filed a motion to dismiss, arguing that this case was moot because UT was promising to no longer consider race. SFFA opposed the motions, contending that the case was not moot because UT's revised policy was still unconstitutional, because UT had not carried its heavy burden to prove that it would not racially discriminate again, and because SFFA sought a permanent injunction and thus had not received all the relief it requested.

SFFA also filed a motion for summary judgment, arguing that UT's original admissions policy was unconstitutional after *Harvard*. SFFA argued that UT's revised admissions policy was unconstitutional, too, because it was not "'color-blind,'" *Harvard*, 600 U.S. at 230, and because UT has failed to take "'every reasonable effort . . . to eradicate [*de jure* racial discrimination] and its insidious residue,'" *United States v. Fletcher ex rel. Fletcher*, 805 F.3d 596, 601 (5th Cir. 2015). SFFA asked the district court to enter a permanent injunction (1) prohibiting UT from reinstating its prior admissions policy or using race as a factor in admissions, and (2) prohibiting any individuals in UT's admissions office from receiving or having access to racial check-box data or aggregate reports on race during the admissions process. ROA.228.[2] In their responses, UT and the Intervenors never explicitly conceded that UT's original admissions policy was

---

[2] SFFA seeks only the second form of injunctive relief on appeal. Specifically, it seeks a declaration that UT's original admissions policy is unlawful, a declaration that UT's revised admissions policy is unlawful, and an injunction prohibiting any individuals in UT's admissions office from receiving or having access to racial check-box data or aggregate reports on race during the admissions process.

unconstitutional, but they also made no effort to defend it. ROA.1995, 1947, 1968. Nor did UT or the Intervenors dispute any of the facts in SFFA's motion for summary judgment. ROA.1995, 1947, 1968.

On July 15, 2024, the district court granted the motions to dismiss, concluding that the case was moot. ROA.2001-13. The district court first held that "UT's revised admissions policy is lawful" because UT no longer "consider[s] race or ethnicity as a factor in the admissions process." ROA.2005-09. The district court found it sufficient that UT had "instructed its admissions officers and employees" not to use race and had "created new processes to train and supervise its admissions officers and employees to ensure that they do not consider race." ROA.2008-09.

The district court concluded that the voluntary-cessation exception to mootness did not apply. The district court stated that *Harvard* "declined to overturn *Grutter* outright," ROA.2007, and stressed that "the legal landscape for affirmative action may well change in the future," ROA.2011-12. Yet it deemed UT's changes nonvoluntary because UT "changed its admissions policies in response to a change in the law—that is, in the aftermath of the *SFFA v. Harvard-UNC* decision." ROA.2009. The court also found that even if UT's changes were voluntary, UT "would still be entitled to a presumption of good faith as a governmental entity," which gave UT a "lighter burden . . . of providing that the challenged conduct will not recur if this case is dismissed as moot." ROA.2010. UT satisfied this "lighter burden" because the court "presume[d] that [UT]

14

made its changes to its admissions policy in good faith, rather than as a litigation maneuver." ROA.2010.

Finally, although the district court did not dispute that there would be a live case if SFFA is entitled to injunctive relief, the court "decline[d] to grant injunctive relief." ROA.2012. The court found that an injunction was unnecessary because UT already revised "its admissions policy so that race and ethnicity are no longer considered." ROA.2011-12. The court believed that it was "mere conjecture for SFFA to assert that [UT] still considers race in its admissions practice." ROA.2011. The court thus concluded that the policies other universities had implemented—restricting access to racial check-box data and aggregate reports on race during the admissions process—would "serve no purpose." ROA.2011.

## SUMMARY OF ARGUMENT

The district court erred for three reasons.

First, this case is not moot. All agree that the case is not moot if UT's new admissions policy violates the Constitution or if SFFA is entitled to injunctive relief. Because the district court got both of those issues wrong, this case is not moot. The district court also incorrectly held that UT carried its heavy burden of proving mootness through voluntary cessation.

Second, SFFA was entitled to summary judgment. UT's original admissions policy violates the Constitution and Title VI. UT's revised admissions policy also is unlawful because it is not "'color-blind,'" *Harvard*, 600 U.S. at 230, and because UT, as a past

15

discriminator, failed to take "'every reasonable effort . . . to eradicate [*de jure* racial discrimination] and its insidious residue,'" *Fletcher*, 805 F.3d at 601. The court should have entered summary judgment for SFFA on liability, with at least declaratory relief to follow.

Third, SFFA was entitled to a permanent injunction. Because "'liability for racial discrimination has been established,'" the district court had a "duty to render a decree that will eliminate the discretionary effects of past discrimination and prevent like discrimination in the future.'" *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015). Yet the district court inexplicably allowed UT's admissions officers to continue to have access to racial check-box data and receive aggregate reports on race during the admissions process—even though admissions officers have no lawful reason for continuing to use race in this way.

This Court should reverse. It should order that SFFA be granted judgment and meaningful relief.

## STANDARD OF REVIEW

This Court "reviews questions of federal jurisdiction, including mootness, de novo." *Tucker v. Gaddis*, 40 F.4th 289, 292 (5th Cir. 2022). "Although this court reviews the denial of a permanent injunction for an abuse of discretion, the district court abuses its discretion if it relies on erroneous conclusions of law." *United States v. Sage Pharms., Inc.*, 210 F.3d 475, 477 (5th Cir. 2000) (cleaned up). "This court reviews the district court's conclusions of law under the *de novo* standard." *Id.*

# ARGUMENT

## I.    This case is not moot.

This case is not moot. UT's new admissions policy still violates the Constitution and Title VI and harms SFFA's members, and the Court can still grant SFFA effective injunctive relief that will prevent UT from discriminating based on race. Regardless, UT has not carried its heavy burden of showing that its voluntary cessation is permanent.

### A.    The case is not moot because UT's policies remain unconstitutional and SFFA has not received all the relief it requested.

The district court did not dispute that, if UT's revised policy is unconstitutional, then this case is not moot. *See* ROA.2005-06. This Court can grant SFFA relief for its "injuries . . . even if their magnitude is reduced." *Texas v. Yellen*, 105 F.4th 755, 766 (5th Cir. 2024); *see, e.g., Big Tyme Invs., LLC v. Edwards*, 985 F.3d 456, 465 (5th Cir. 2021). Because "[t]he gravamen of [SFFA's] complaint is that its members are disadvantaged in their efforts" to obtain admission to UT, SFFA's case is still live, even if UT's new policy "may disadvantage [SFFA's members] to a lesser degree than the old one." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993). And because UT's revised admissions policy is unlawful, as explained further below, the case is not moot.

In addition, SFFA's request for injunctive relief is not moot. "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 307 (2012) (cleaned up). If a

party received "the *precise relief* . . . requested in the prayer for relief in th[e] complaint," then the case will be moot. *N.Y. State Rifle & Pistol Ass'n, Inc. v. NYC*, 590 U.S. 336, 338-39 (2020) (emphasis added); *Gulfport Energy Corp. v. FERC*, 41 F.4th 667, 680 (5th Cir. 2022) (a case is moot when "a party receives complete relief"). But if a plaintiff's injuries are only "partially redressed," then a live case remains. *Crocker v. Austin*, 115 F.4th 660, 667-68 (5th Cir. 2024). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox*, 567 U.S. at 307-08 (cleaned up); *see, e.g.*, *Clarke v. CFTC*, 74 F.4th 627, 636 (5th Cir. 2023) (case not moot because "[t]he parties continue to spar over" whether an injunction is warranted).

Here, SFFA sought a permanent injunction prohibiting any individuals in UT's admissions office from receiving or having access to racial check-box data or aggregate reports on race during the admissions process. That request for injunctive relief likewise isn't moot because UT admits that it is continuing these practices. ROA.1778-79, 1786-88.

The district court implicitly recognized that, if SFFA is entitled to injunctive relief, the case is not moot. ROA.2010-12. So, it held that SFFA was not entitled to injunctive relief—on the merits, something that shouldn't have been possible if the case were moot and the Court lacked jurisdiction. ROA.2010-12. In all events, this refusal was improper, as explained further below. This case is not moot.

**B.    UT has not carried its heavy burden to prove that it won't consider race in admissions.**

Even if UT's new policy were lawful, the parties' controversy over the policy in place when SFFA sued is still live. UT did not comply with a new statute or regulation. *See* ROA.1648, 2009 (citing *Daves v. Dallas Cty., Tex.*, 64 F.4th 616, 633-35 (5th Cir. 2023) (case was moot after "changes made by the Texas legislature")). UT sought to moot this case through "'voluntary compliance'" with the Supreme Court's *Harvard* decision. *FFRF v. Abbott*, 955 F.3d 417, 425 (5th Cir. 2020) ("'voluntary compliance'" with intervening Supreme Court decision did not moot the case).

"It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). "If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Id.* (cleaned up). Thus, the standard "for determining whether a case has been mooted by the defendant's voluntary conduct is stringent." *Id.* "'A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *FFRF*, 955 F.3d at 425 (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)); *see Tucker*, 40 F.4th at 293. This "'heavy burden'" lies with the party asserting mootness. *Friends of the Earth*, 528 U.S. at 189. UT cannot carry its formidable burden

because it isn't "'absolutely clear'" that its wrongful racial discrimination cannot "'be expected to recur.'" *Id.*

To begin, UT has *never promised* not to bring back its old policies. *See generally* ROA.1654-64, 1954-56. This refusal to commit to its new path weighs heavily against mootness. *See, e.g., Tucker*, 40 F.4th at 293 ("[T]he government has not even bothered to give Tucker any assurance that it will permanently cease engaging in the very conduct that he challenges."); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328-29 (5th Cir. 2020) (no mootness where "the University has not issued a controlling statement of future intention").

But "[e]ven assuming [UT has] no intention to alter or abandon" its new procedures, "the ease with which [it] could do so counsels against a finding of mootness, as 'a case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the provision.'" *Bell v. City of Boise*, 709 F.3d 890, 900 (9th Cir. 2013). UT's race-based admissions policy was not "'implemented by [state] statute or regulation,'" but is merely an "internal policy." *Id.* at 900-01. Indeed, "the authority to establish policy" governing admissions appears to be "vested entirely" in the Office of Admissions, "such that the new policy . . . could be easily abandoned or altered in the future." *Id.; see* ROA.1657 [¶12]. A plaintiff's lawsuit is not mooted when the new policy can be so easily withdrawn. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 769 (6th Cir. 2019) (claims not mooted by new policy issued by officials who have no "control over whether the University will reimplement" the former policy); *Hernandez v. Cremer*, 913

F.2d 230, 235 (5th Cir. 1990) (claims not mooted by new policy that was "subject to withdrawal at the discretion of the Service's District Director"); *United States v. Atkins*, 323 F.2d 733, 738-39 (5th Cir. 1963) (claim for injunction against racial discrimination in voter registration was not mooted where "[t]he only assurance . . . [was] the word of the present Registrars, not binding on [future appointees]"); *see also Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir. 1998) (policy change did not moot a case because it was "not implemented by statute or regulation and could be changed again"); *Reynolds v. Preston*, No. 22-cv-8408, 2023 WL 2825932, at *6 (N.D. Cal. Mar. 15, 2023) ("[A] 'policy change' announced in a declaration submitted with a motion . . . is 'not governed by any clear or codified procedures' and so cannot moot a claim.").

The district court pointed to *Harvard* as the reason for UT's new admissions policy, ROA.2009, yet UT has never conceded that *Harvard* compels the conclusion that UT's admissions policies are unlawful. UT is *choosing* not to argue—as the district court suggested—that *Grutter* and *Fisher* remain good law, that its use of race in admissions is more tailored than Harvard's or UNC's, that its use of race pursues another compelling interest, or anything else. *Cf.* ROA.1646-52, 1928-36. While defendants need not always "renounce [their] prior conduct" for a case to become moot, *Boudreaux v. La. State Bar Ass'n*, 86 F.4th 620, 630 (5th Cir. 2023), courts are nevertheless "skeptical of claims of mootness where the defendant yields in the face of a court order but does not admit that the complained-of conduct was unlawful," *CAIR-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 377 (D. Minn. 2020) (cleaned up); *see FFRF*, 955 F.3d at

21

425 (no mootness where the government defendants argued only "that their behavior will change post-*Matal*"); *Schlissel*, 939 F.3d at 770 (no mootness where the University argued that "'[e]ven before'" it abandoned its policy, the policy "'easily met constitutional standards'"). Such silence undermines a defendant's assurances that it is "'absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *FFRF*, 955 F.3d at 425. And that remains the appropriate test, even in cases of "*involuntary* cessation" due to changes in the law. *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 408 F. Supp. 3d 960, 989 (S.D. Iowa 2019), *aff'd*, 5 F.4th 855 (8th Cir. 2021).

Even assuming that UT will never officially and openly return to race-based admissions, this case is still not moot. That is because UT has failed to "implemen[t] . . . procedural safeguards" to ensure that its admissions officers do not violate its new policy and continue to consider race. *Fikre v. FBI*, 904 F.3d 1033, 1040 (9th Cir. 2018) (case not moot where plaintiff was removed from the No Fly List but the government had not "verified the implementation of procedural safeguards conditioning its ability" to put him back on), *aff'd*, 601 U.S. 234 (2024). Because admissions officers who make admissions decisions continue to have free access to racial check-box data and aggregate reports, they could easily—and discretely—continue to employ racial preferences. ROA.1778-79, 1786-88. Indeed, it is "assumed" that racial information that is solicited and not concealed from decisionmakers "will form the basis" for decisions. EEOC, *Pre-Employment Inquiries and Race*, perma.cc/3TE5-PUKP. UT's failure to guard against such violations weighs strongly against mootness.

The district court held that UT must receive a "presumption of good faith" that it will not racially discriminate again. ROA.2010 (citing *FFRF, Inc. v. Abbott*, 58 F.4th 824, 833 (5th Cir. 2023)). But this presumption of good faith for government actors should no longer be good law. The Supreme Court recently held in *FBI v. Fikre* that the same "'formidable burden'" of proving that voluntary cessation is permanent "holds for governmental defendants *no less than for private ones*." 601 U.S. 234, 241 (2024) (emphasis added); *accord Rd.-Con, Inc. v. City of Philadelphia*, --- F.4th ---, 2024 WL 4597253, at *5-6 (3d Cir. Oct. 29, 2024).[3]

Yet even before *Fikre*, the "relaxed standard" for governments "[was] not . . . applied to voluntary cessation by a public university." *Fenves*, 979 F.3d at 328; *see FFRF*, 58 F.4th at 835 n.7 (noting that mootness principles apply differently in "the distinct context of 'voluntary cessation by a public university'" (quoting *Fenves*, 979 F.3d at 328)). For good reasons. Unlike state legislators, university officials are not elected, accountable, or subject to external procedures that constrain their policymaking. And universities have a notoriously bad record of repealing policies when they are sued, only to reinstate them after litigation ends. *See* Lukianoff & Goldstein, *Speech Code Hokey Pokey*, Volokh Conspiracy (Sept. 12, 2018), perma.cc/Q32F-RPEK; Amicus Br. of FIRE,

---

[3] In *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, which was issued three months after *Fikre*, this Court applied the good-faith presumption in its mootness analysis. 103 F.4th 383, 395-96 (5th Cir. 2024). But the opinion does not mention *Fikre*, and it does not appear that the plaintiff ever argued that *Fikre* abrogated the presumption of good faith for governmental defendants.

*Speech First, Inc. v. Sands*, 2023 WL 6161318, *21-25 (S.Ct.) ("Time and time again, . . .
universities revise unconstitutional policies, only to bring them back." (discussing ex-
amples)); *Fenves*, 979 F.3d at 328 ("This is not the first appeal in which a public univer-
sity has had a sudden change of heart, during litigation . . . and then advocated moot-
ness."). Deference would be especially inappropriate for UT—a decades-long race dis-
criminator who wants courts to assume good faith on the very question of whether it
will racially discriminate again. *Cf. Fisher I*, 570 U.S. at 371 (refusing to give universities,
and UT specifically, deference on race); *Harvard*, 600 U.S. 230-31 (warning that univer-
sities cannot recreate race-based admissions through covert means).

 Even if such a presumption applied, it would not be difficult to overcome here,
especially after *Fikre*. Particularly given UT's refusal to adopt basic procedural reforms
to prevent its admissions officers from using race in the admissions process, UT has
not made it "'absolutely clear the allegedly wrongful behavior could not reasonably be
expected to recur.'" *FFRF*, 955 F.3d at 425.

## II. The district court erred in refusing to grant summary judgment to SFFA.

 This Court should reverse and direct the entry of summary judgment for SFFA.
Both UT's original admissions policy and its revised policy violate the Constitution and
Title VI.

 **1.** The district court erred in declining to grant SFFA summary judgment as to
UT's longstanding admissions policy. In its motion for summary judgment, SFFA ex-
plained why UT's longstanding use of race in admissions is unlawful. *See* ROA.1717-18,

1723-26. The Supreme Court proclaimed in *Brown v. Board of Education* that the right to public education "must be made available to all on equal terms." 347 U.S. 483, 493 (1954). The Court in *Harvard* built on *Brown*, holding that "'[o]ur Constitution is color-blind,'" and that all "'racial discrimination in public education,'" including the race-based admissions practiced by "[m]any universities," is prohibited by the Constitution. 600 U.S. at 204, 230-31.

Under a straightforward application of *Harvard*, UT's use of race in admissions fails strict scrutiny's "daunting two-step examination." *Id.* at 206-07. UT cannot articulate a "'compelling governmental interes[t]'" for its use of race. *Id.* at 207. UT's original justifications (like promoting the "educational benefits" of diversity) are "elusive" and "imponderable," incapable of being objectively "measured" by courts, and thus "not sufficiently coherent for purposes of strict scrutiny." *Id.* at 214-15; *see* ROA.1723-24. Even if UT had a compelling interest, its use of race is not narrowly tailored. There is no "meaningful connection" between UT's use of race and the goals it pursues; UT uses race as a "negative" and as a "stereotype"; UT never articulated an "end point"; and UT has engaged in racial balancing. 600 U.S. at 215, 218, 221-25; *see* ROA.1724-26.

In response to SFFA's motion for summary judgment, UT and the Intervenors never explicitly conceded that UT's policy is unlawful; but they also make no effort to defend it. *See* ROA.1995, 1947, 1968. Though this implicit concession does not moot the case, it does mean that SFFA is entitled to judgment. *See Pope v. United States*, 323 U.S. 1, 11-12 (1944) ("[I]t is not any the less a case or controversy . . . because the

plaintiff's claim is uncontested or incontestable. . . . It is a judicial function and an exercise of the judicial power to render judgment on consent."). Accordingly, if the Court determines that the case is not moot, then it should enter summary judgment for SFFA and declare UT's policy unconstitutional.

**2.**  The district court also erred in refusing to grant SFFA summary judgment as to UT's revised admissions policy. The district court concluded that "UT's revised admissions policy is lawful" because UT has "instructed its admissions officers and employees" not to consider race or ethnicity and "created new processes to train and supervise its admissions officers and employees to ensure that they do not consider race or ethnicity as a factor in the admissions process." ROA.2008-09. But these purported changes have not fixed the constitutional or statutory problem for two reasons.[4]

First, UT has refused to adopt a "'color-blind'" admission process, as strict scrutiny requires. *Harvard*, 600 U.S. at 230; *see also Plessy v. Ferguson*, 163 U.S. 537, 554 (1896) (Harlan, J., dissenting) ("[T]he constitution of the United States does not . . . permit any public authority to know the race of [citizens]."). UT admits that it gathers "check-box" racial data from every applicant and that it makes that data available to every admissions officer who reviews applications and provides "holistic" scores for each applicant. ROA.1778-79, 1786-88. UT also provides numerous "senior admissions officers" with

_____

[4] Although the district court said that it had no need to decide SFFA's motion for summary judgment because the case was moot, ROA.2013, the district court effectively denied SFFA's motion on the merits because it held (albeit with little explanation) that "UT's revised admissions policy is lawful," ROA.2008-09.

the aggregate racial composition of the admitted class along with the year-over-year changes, which are updated daily. ROA.1778-79, 1786-88. UT has no lawful interest in continuing to infuse race into its admissions process.

Second, even if the Court believes that UT's new system is "race neutral," UT still hasn't brought itself into compliance with the Fourteenth Amendment. When a State abandons *de jure* racial discrimination, its "adoption and implementation of race-neutral policies alone [does not] suffice to demonstrate that the State has completely abandoned its prior . . . system." *United States v. Fordice*, 505 U.S. 717, 729 (1992). The Equal Protection Clause is "offended by 'sophisticated as well as simple-minded modes of discrimination.'" *Id.* UT must prove that it has taken "'every reasonable effort . . . to eradicate [*de jure* racial discrimination] and its insidious residue.'" *Fletcher*, 805 F.3d at 601; *see Fordice*, 505 U.S. at 743. But it has not done so. By refusing to blind itself to racial data while maintaining a subjective selection process, UT has not met its burden of ending its violations of equal protection.

At bottom, UT has never provided a legitimate justification for its continued use of racial data in the admissions process. If UT's admissions officers will never use race in the admissions process, why does UT continue to give them access to this data? Why not take simple technological steps (as other universities have done) to prevent admissions officers from accessing this constitutionally forbidden data? And even assuming UT needs aggregate racial data for legitimate, non-admissions purposes, why does UT

27

provide these data to *admissions officers mid-cycle* instead of individuals outside the admissions office, or after the admissions decisions are complete? *See* EEOC, *supra*. UT has no answer to these questions, which dooms its belated, halfway effort to survive strict scrutiny after its long-held commitment to the use of race.

## III.    The district court improperly refused to enter a permanent injunction.

Below, SFFA asked the district court to enter a permanent injunction prohibiting any individuals in UT's admissions office from receiving or having access to racial check-box data or aggregate reports on race during the admissions process. The district court's refusal to do so was error.

"'Once liability for racial discrimination has been established, a district court has the duty to render a decree that will eliminate the discretionary effects of past discrimination and prevent like discrimination in the future.'" *Howe*, 801 F.3d at 753. Courts "must not shrink from their obligation to enforce the constitutional rights of all persons." *Brown v. Plata*, 563 U.S. 493, 511 (2011) (cleaned up). Courts should enjoin both conduct that "'has been found to have been pursued'" and conduct that is "'related to the proven unlawful conduct.'" *Howe*, 801 F.3d at 753 (quoting *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994)).

To receive a permanent injunction, a plaintiff must demonstrate: "'(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balances of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4)

that the public interest would not be disserved by a permanent injunction.'" *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 272-73 (5th Cir. 2014). A district court may enjoin UT's admissions policies "in whole or in part." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 144-45 (2010). SFFA satisfies all four requirements for a permanent injunction.

**1.** A constitutional violation is irreparable harm. *See, e.g.*, *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012); *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762-63 (8th Cir. 2008); *Vote.org v. Callanen*, 609 F. Supp. 3d 515, 539 (W.D. Tex. 2022), *rev'd on other grounds*, 89 F.4th 459 (5th Cir. 2023); *Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446, 470-71 (N.D. Tex. 2012). That rule "includes violation[s] of . . . the Equal Protection Clause." *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 529 (S.D. Tex. 2020); *see, e.g.*, *DynaLantic Corp. v. DOD*, 885 F. Supp. 2d 237, 292 (D.D.C. 2012); *Smith v. South Dakota*, 781 F. Supp. 2d 879, 887 (D.S.D. 2011).

That UT has modified its admissions policies in response to *Harvard* does not eliminate the need for a permanent injunction, contra the district court. ROA.2011. "A 'court's power to grant injunctive relief survives discontinuance of the illegal conduct,' and because the 'purpose . . . is to prevent future violations,' injunctive relief is appropriate when there is a 'cognizable danger of recurrent violation, something more than the mere possibility.'" *DOJ v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *accord United States v.*

*Bob Lawrence Realty, Inc.*, 474 F.2d 115, 126 (5th Cir. 1973) ("The purpose of an injunction is to prevent future violations, and, of course, it can be utilized even without a showing of past wrongs."). "Once a violation is demonstrated, all that need be shown is that 'there is some reasonable likelihood of future violations,' and past unlawful conduct is 'highly suggestive of the likelihood of future violations.'" *Daniel Chapter One*, 89 F. Supp. 3d at 143 (quoting *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).

The district court believed that it was "mere conjecture for SFFA to assert that UT Austin still considers race in its admissions practice." ROA.2011. Not so. As explained, UT's revised admissions policy *still* considers race unlawfully. Even if it didn't, the undisputed facts show that there remains a "'cognizable danger of recurrent violation.'" ROA.2011. UT provides every person in the admissions office with access to each applicant's race, and it provides every senior admissions officer with a report containing *daily* aggregated racial data along with year-over-year changes. UT's assurances that admissions officers are instructed not to use race don't come close to curing the problem. They have used race before, and they still have the practical ability to do so in the future with ease. And UT has never provided a legitimate reason for refusing to implement these simple reforms, which contrasts with the many universities that have modified their policies to remove the use of race in admissions in response to *Harvard*. *Supra* at 10-11; *cf. Floyd v. City of N.Y.*, 959 F. Supp. 2d 668, 675 (S.D.N.Y. 2013) (issuing permanent injunction and noting the "many municipalities that ha[d] reached

settlement agreements or consent decrees when confronted with evidence of police misconduct").

The district court suggested there were "lawful (and legally mandated) reasons" for UT to "continu[e] to maintain certain racial data." ROA.2011. That misses the point. SFFA has not challenged whether UT *as an institution* can collect racial data. SFFA argues that UT can't give its *admissions* officers access to check-box data and provide them with aggregate racial reports throughout the admissions process. Neither the district court nor UT ever addressed this argument. Nor can UT answer basic questions. If racial check-box data will play no role in the admissions process, why does UT give every one of its admissions officers access to the data? Why not blind them to this forbidden tool like other universities? And if the overall racial makeup of the class is irrelevant after *Harvard*, why does UT continue to provide "senior admissions officers" with the aggregate racial composition of the admitted class? UT has no explanation.

**2.** SFFA's injuries cannot be compensated with money damages. *See De Leon v. Perry*, 975 F. Supp. 2d 632, 663-64 (W.D. Tex. 2014). SFFA's members are "being denied the 'opportunity to compete for admission on an equal basis.'" *SFFA*, 37 F.4th at 1086. This denial of equal protection is not "capable of calculation or estimation." *Free Speech Coal., Inc. v. Colmenero*, 689 F. Supp. 3d 373, 415 (W.D. Tex. 2023), *vacated in part on other grounds*, 95 F.4th 263 (5th Cir. 2024); *see, e.g., MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005) ("[L]ost opportunities . . . are difficult, if not impossible, to quantify."); *Commonwealth Sci. & Indus. Rsch. Org. v. Buffalo Tech. Inc.*, 492 F. Supp.

2d 600, 604 (E.D. Tex. 2007) ("[T]he harm of lost opportunities is irreparable."). Racial discrimination in particular causes dignitary and other harms that cannot be fully remedied with money damages. *See AAER v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 780 (11th Cir. 2024).

**3.** The balance of hardships favors a permanent injunction. The public always has a "'profound and long-term interest in upholding an individual's constitutional rights.'" *Awad v. Ziriax*, 670 F.3d 1111, 1131-32 (10th Cir. 2012); *Am. Beverage Ass'n v. City & Cty. of San Fran.*, 916 F.3d 749, 758 (9th Cir. 2019). And if UT is no longer using race in the admissions process, then it will suffer no harm by being forced to do what it already claims to be doing. *See Joyce v. Town of Dennis*, 720 F.3d 12, 25 (1st Cir. 2013) ("[N]o apparent harm would befall defendants from . . . following a policy that they already have adopted.").

Moreover, UT has never disputed that it could easily implement the administrative changes needed to stop making racial check-box data and aggregate racial data available to its admissions staff. *See generally* ROA.1646-52, 1946-51; *cf. Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (finding "the Universities' interest in preserving their current admissions and financial-aid programs during this enrollment cycle" insufficient to justify a preliminary injunction). Indeed, UT's peer universities have already taken these steps. Implementing these procedures "creates a safe distance" between admissions officers and racial data, and guards against "any

attempts by [UT] to circumvent" the constitutional bar against using race. *De Boulle Diamond & Jewelry, Inc v. Boulle, Ltd.*, No. 12-cv-1462, 2015 WL 5033893, at *5 (N.D. Tex. Aug. 25, 2015); *accord Floyd*, 959 F. Supp. 2d at 671. By contrast, the benefit of a permanent injunction would be significant, ensuring that applicants are free from "'governmentally imposed discrimination based on race.'" *Harvard*, 600 U.S. at 206.

**4.** The public interest favors a permanent injunction. "'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014). Indeed, "the constitutional imperatives of the Equal Protection Clause must have priority over the comfortable convenience of the status quo." *Williams v. Illinois*, 399 U.S. 235, 245 (1970); *see also Rush v. Nat'l Bd. of Med. Exam'rs*, 268 F. Supp. 2d 673, 679 (N.D. Tex. 2003) ("[T]he public interest [is] in prohibiting discrimination by public entities.").

## CONCLUSION

This Court should reverse the district court. The Court should instruct the district court to grant SFFA summary judgment and declare that UT's longstanding and revised uses of race in admissions are unlawful. The Court should further instruct the district court to enter a permanent injunction prohibiting any individuals in UT's admissions office from receiving or having access to racial check-box data or aggregate reports on race during the admissions process.

Dated: November 15, 2024

Respectfully submitted,

_/s/ J. Michael Connolly_

Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
Steven C. Begakis
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com

_Counsel for Students for Fair Admissions, Inc._

## CERTIFICATE OF SERVICE

I filed a true and correct copy of this brief with the Clerk of this Court via the

CM/ECF system, which will notify all counsel.

*/s/ J. Michael Connolly*

*Counsel for Students for Fair
Admissions, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7)(B) because it contains 8,537 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced font using Microsoft Word version 16.90 in 14-point Garamond font.

_/s/ J. Michael Connolly_

*Counsel for Students for Fair Admissions, Inc.*